UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AMX INTERNATIONAL, INC., an Idaho corporation,<br><br>        Plaintiff,<br><br>  v.<br><br>BATTELLE ENERGY ALLIANCE, LLC, a Delaware limited liability company,<br><br>        Defendant. | Case No. 1:09-CV-210-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Defendant Battelle Energy Alliance, LLC's Motion for Summary Judgment (Docket No. 29.) Oral argument was held on August 25, 2010, and the motion is at issue. For the reasons expressed below, the Court will grant Battelle's Motion for Summary Judgment.

## BACKGROUND

Plaintiff AMX International, Inc. operates a business and information technology consulting company. It contracts with private companies and government entities to provide software and other computer consulting, support, and training services. The

services AMX offers include the provision of technology support staff. AMX hires IT professionals, and then subcontracts their services to its clients.

When hired, all AMX employees sign non-competition agreements that prohibit them from "[d]irectly or indirectly working as or for an Active Client" for a period of 12 months following employment with AMX. *See, e.g., William R. Newland Non-Competition Agreement,* Dkt. 29-18. An Active Client is: "a person, business or entity that AMX has sent an invoice to or concerning within the prior 24 months and who is listed in the invoice as the 'client' or under the 'Bill to.'" *Id.*

In March 2006, AMX began providing its employees' IT services to Battelle. Typically, AMX service contracts contain an Employment Recruitment provision prohibiting the client from soliciting or hiring AMX employees. But Battelle has a policy against the inclusion of such clauses in its services contracts, and AMX never requested that its standard no-hire provision be included in any of its contracts with Battelle. Therefore, no contract barred Battelle from hiring former AMX employees. AMX admitted this, according to Battelle, by noting in an internal company email, "there is nothing that restricts [Battelle] from hiring AMX employees." *May 23, 2007 Email from Brent Stacey to Jay Price* at PLA008, Dkt. 29-9. Battelle, however, did know that each AMX employee subcontracted to Battelle had a non-competition agreement with AMX, which prohibited the employee from working directly for Battelle.

It is undisputed that former AMX employees applied for jobs working directly for Battelle and were hired. In 2008, AMX filed a suit against former employee Trevor Ball

to enforce Ball's covenant not to compete. The state court denied AMX's request for preliminary injunctive relief, and AMX withdrew its complaint.

AMX now alleges that Battelle tortiously interfered with its employee non-competition agreements by "hir[ing] away AMX employees assigned to work at the BEA worksite." *Am. Compl.* ¶ 29, Dkt. 20. AMX complains that Battelle's conduct – recruiting and inducing AMX employees to breach their noncompetition agreements – "has deprived AMX of no less than $2 million in fees to date." *Id.* ¶ 24. Battelle seeks summary judgement on AMX's claim.

## LEGAL STANDARD

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152,

1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

Four elements must be proven in order to establish a prima facie case of tortious interference with contract. The plaintiff must show that 1) there was a contract in existence; 2) the defendant knew of the contract; 3) the defendant intentionally interfered with the contract, causing a breach; and 4) injury to the plaintiff resulted from the breach. *Magic Valley Truck Brokers, Inc. v. Meyer*, 982 P.2d 945, 950 (Idaho Ct. App. 1999).

In this case, AMX asserts that Battelle tortiously interfered with the AMX employees' noncompete agreements. To prevail on this claim, AMX must prove that Battelle, with knowledge of the agreements, engaged AMX employees to perform work that violated their noncompete agreements. *Magic Valley Truck Brokers v. Meyer*, 982 P.2d 945, 951 (Idaho Ct. App. 1999).

1. **Battelle Was a Stranger to the Noncompete Agreements.**

A claim for tortious interference with contract, however, also requires proof that the defendant is a stranger to the contract with which the defendant allegedly interfered and to the business relationship giving rise to the contract. *Beco Constr. Co., Inc. v. JUB Engineers*, 184 P.3d 844 (Idaho 2008). Battelle insists it is not a stranger to the noncompetition agreements and therefore cannot be liable for tortious interference with the covenants not to compete.

In *Beco*, the Idaho Supreme Court applied the "stranger to the contract" doctrine in a suit by a general contractor for a city development project against the city and the project engineer hired by the city to monitor the project's progress. 184 P.3d at 847. The contractor alleged the project engineer interfered with the construction contract by

conducting unnecessary testing and unreasonably shutting down the project. The court held that the project engineer could not be liable for tortious interference with the construction contract because the project engineer was acting as the city's agent and for the city's benefit, and therefore it was not a stranger to the contract. *Id.* at 850.

Application of *Beco* here is unclear. If Battelle had been acting as an agent of AMX or of AMX's employees, *Beco* would clearly dictate granting summary judgment in favor of Battelle. But Battelle was neither an agent of AMX or AMX's employees. In an effort to accommodate the facts of this case, it urges the Court to take a more expansive view of the court's holding in *Beco*. It contends that under Idaho law, an entity that "has ***any*** beneficial or economic interest in, or control over" the business relationship underlying the allegedly disrupted contract, is not a stranger to the contract and cannot be held liable for interference with that relationship. *Battelle Br.* at 6 (emphasis in original).

Based on a careful review of *Beco*, the Court does not believe the Idaho Supreme Court intended to articulate such a broad rule. The *Beco* opinion must be construed in light of its facts. *Hash v. U.S.,* 454 F. Supp. 2d 1066, 1072 (D. Idaho 2006) (quoting *Bashore v. Adolf*, 41 Idaho 84, 238 P. 534 (1925)). As explained by the Idaho Supreme Court, "[t]here is a pronounced line of demarcation between what is said in an opinion and what is decided by it." *Id.* (internal quotation marks omitted). In *Beco*, the court held that the defendant was not a stranger to the contract because he acted as an agent of a contracting party. It did not discuss the immunity of an entity who was neither a party to the contract nor an agent to a contracting party.

**MEMORANDUM DECISION AND ORDER- 6**

Every decision cited by *Beco* to support its holding is equally inapplicable. *Jenkins v. Boise Cascade Corp.*, 108 P.3d 380, 390 (2005); *Leon v. Boise State Univ.*, 870 P.2d 1324, 1328-29 (1994); *Ostrander v. Farm Bureau Mut. Ins. Co. of Idaho*, 851 P.2d 946, 950 (1993). In those cases, it was clear the defendant was either a contracting party or its agent who could not be liable for interference. None considered the potential liability of non-contracting parties with only some general economic interest or other stake in the contract or underlying business relationship.

Given the absence of any clear directive from the Idaho Supreme Court extending the "stranger to the contract" defense beyond parties to the contract or their agents, this Court cannot find that Battelle should be immune from a tortious interference claim simply because it had some interest in the employment relationships at issue here.

**2.      The Doctrine of Quasi-Estoppel Does Not Apply.**

Nor is the Court persuaded by Battelle's argument that AMX should be estopped from asserting a tortious interference claim against Battelle. According to Battelle, AMX's failure to request the inclusion of its standard no-hire provision in its service contract with Battelle precludes AMX from now changing its position and pursuing a claim against Battelle for tortious interference with the noncompete agreements.

Quasi-estoppel prevents a party from reaping an unconscionable advantage, or from imposing an unconscionable disadvantage upon another, by taking a position inconsistent with a previous position. *Garner v. Bartschi*, 80 P.3d 1031 (2003). Here, the doctrine of quasi-estoppel does not apply.

First, it is questionable whether AMX "changed its positions" by not requesting a no-hire provision and then later asserting its legitimate tort remedies. AMX has consistently required that its employees sign noncompete agreements preventing them from working for Active Clients, such as Battelle, upon leaving AMX's employ. This suggests AMX has maintained a constant position regarding Battelle's right to hire AMX employees – not that it has taken inconsistent positions.

Second, even assuming AMX changed positions, AMX's conduct did not rise to the level of being unconscionable. At best, AMX simply abandoned its contractual remedies. But AMX did not need a belt-and-suspenders approach to protect itself against Battelle's allegedly tortious hiring of AMX employees. Even in the absence of a no-hire provision, Idaho law still prohibits a party from knowingly engaging an employee to work for him in an activity that would violate the employee's noncompete agreement. *Magic Valley Truck Brokers v. Meyer*, 982 P.2d 945, 951 (Idaho Ct. App. 1999). AMX did not give up this legal protection when it failed to demand additional contractual protection. Therefore, there is no evidence that Battelle has suffered a significant disadvantage by AMX's failure to request a no-hire provision.

### 3. AMX's Noncompete Agreements Are Void and Unenforceable

Battelle puts forth a third argument – that AMX's tortious interference claims fails as a matter of law because its employee noncompete agreements are void and unenforceable. AMX responds that the enforceability of the noncompete agreements is irrelevant because a claim for tortious interference with contract does not require the

existence of an enforceable contract.

AMX is correct to an extent – "[p]rotection is extended against unjustifiable interference with contracts even though the contract is voidable or unenforceable in an adversary proceeding." *Barlow v. International Harvester Co.*, 522 P.2d 1102, 1114 (1974). But this protection does not extend to contracts void ab initio. *Id.* at 1114, n. 2. Contracts that are void ab initio are deemed never to have existed in the eyes of the law and cannot form the basis for a tortious interference action. *Thompson v. Ebbert*, 160 P.3d 754, 757 (Idaho 2007). The threshold issue in this case, then, is whether an unreasonable covenant not to compete is void ab initio or simply voidable.

No Idaho court has squarely answered this question. The Court must therefore predict how the Idaho Supreme Court would resolve the issue. *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 186 (9th Cir.1989), cert. denied, 493 U.S. 1058 (1990).

Under Idaho law, "a contract is usually void ab initio if its subject matter is in some manner opposed to public policy so that the law will not aid in upholding it." *Southern Idaho Realty of Twin Falls, Inc.-Century 21 v. Larry J. Hellhake and Associates, Inc.,* 636 P.2d 168, 172-173 (Idaho 1981). Covenants not to compete must be consistent with public policy to be enforceable, and they must be reasonable as applied to the public in addition to the employer and employee. *Pinnacle Performance, Inc. v. Hessing,* 17 P.3d 308, 311 (Idaho Ct. App. 2001). Conversely, unreasonable covenants not to compete are unenforceable because of the public policy against restraints of trade and the hardships resulting from interference with a person's means of livelihood. *Cf.,*

*McCandless v. Carpenter*, 848 P.2d 444, 448 (Idaho Ct. App. 1993). Because an *unreasonable* covenant not to compete violates public policy, it follows that an unreasonable noncompete agreement is void ab initio.

This conclusion is consistent with other jurisdictions addressing this issue. *See, e.g., NCH Corp. v. Share Corp.*, 757 F.2d 1540 (5th Cir. 1985). In *NCH Corp.*, the court held that unreasonable covenants not to compete are void rather than merely voidable "because of the public policy against restraints of trade and the hardships resulting from interference with a person's means of livelihood." *Id.* at 1543. Distinguishing between void and voidable contracts, the court therefore allowed the current employer to assert the unenforceability of the underlying noncompete agreements as a defense to the former employer's tortious interference claim – despite the rule in Texas that the unenforceability of the underlying contract is normally no defense.

The Court finds the reasoning of *NCH Corp.* persuasive. In Idaho, like Texas, unreasonable noncompete agreements violate public policy and are thus void. Additionally, the Court finds that the social interest in competition that underpins the prohibition against unreasonable noncompete agreements equally justifies protecting defendants who do business with former employees unfairly shackled by unreasonable noncompete agreements. For these reasons, the Court concludes that Battelle may assert the unenforceability of the underlying noncompete agreements as a complete defense to AMX's tortious interference action *if* the noncompete provisions are found unreasonable and violative of public policy.

This leaves the question of whether the noncompete agreements at issue here are unreasonable and unenforceable as a matter of law. "Covenants not to compete in employment contracts are 'disfavored' and 'strictly construed against the employer.'" *Intermountain Eye & Laser Ctrs., P.L.L.C. v. Miller*, 127 P.3d 121, 127 (2005) (quoting *Freiburger v. J-U-B Engineers, Inc.*, 111 P.3d 100, 105 (Idaho 2005)). A covenant not to compete will only be enforced if the covenant: "(1) is not greater than is necessary to protect the employer in some legitimate business interest; (2) is not unduly harsh and oppressive to the employee; and (3) is not injurious to the public." *Freiburger*, 111 P.3d at 105.

The Court must first determine whether AMX has a legitimate interest worthy of protection. *Freiburger*, 111 P.3d at 105. Here, it is undisputed that AMX has a protectable interest in the customer relationships its former employees "established and/or nurtured" while employed by AMX; it is therefore entitled to protect itself from the risk that a former employee might appropriate customers by taking unfair advantage of the contacts developed while working for AMX. *Id.* AMX asserts no other protectable interests. *See AMX Resp.* at 16.

Next, the Court must consider whether the noncompete agreements are a reasonable means of protecting AMX's legitimate business interest. To be expected, Battelle argues that the noncompete agreements are overly broad. Specifically, it challenges the provision prohibiting former AMX employees from "[d]irectly or indirectly working as or for an Active Client of AMX." This restriction, says Battelle, is

not a reasonable means of protecting AMX's interest in the client relationships its employees helped to develop because the clause is not limited to clients with whom the AMX employees actually interacted.

The Court shares the concern that the noncompete agreements are more restrictive than necessary according to the standards set forth in *Freiburger, supra*. In *Freiburger*, a civil engineer employed by J-U-B signed a covenant not to compete that prohibited him from providing any services to J-U-B's clients without regard to whether he had any contact with these clients. 111 P.3d at 103. When Freiburger resigned from J-U-B, he took a job with a competing engineering firm, which asked him to market to a current J-U-B client that Freiburger had "nurtured" while employed with J-U-B. *Id.* Id. J-U-B sought to enforce its covenant against Freiburger. *Id.* The trial court granted summary judgment in favor of Freiburger, finding the covenant not to compete unenforceable as a matter of law, and J-U-B appealed. *Id.*

The Idaho Supreme Court affirmed. It held that the covenant was "clearly an overbroad means of protecting J-U-B's legitimate interest" because it prohibited Freiburger from: (1) contacting past or current J-U-B's clients "regardless of whether Freiburger helped to develop J-U-B's goodwill effort toward that client"; (2) providing *any* services to J-U-B's clients without defining "services"; and (3) contacting "pending" clients without defining "pending" and without any goodwill limitation. *Id.* at 107.

Moreover, the court refused to reform the parties' agreement because reformation would have required more than adding or changing a few words to make it reasonable.

*Id.* at 108. Therefore, according to the court, "the only alternative was to declare the entire clause void and unenforceable as a matter of law." *Id*

The Idaho Supreme Court reached a similar result in *Pinnacle*. As in *Freiburger*, the *Pinnacle* court affirmed the trial court's decision to grant summary judgment in favor of the employee. 17 P.3d at 314. The court held that the absence of any geographic limitation, coupled with a prohibition against doing business with any Pinnacle client, rendered the noncompete agreement overly broad. *Id.* The court also objected to the broad prohibition against performing any "service" for Pinnacle clients, given that "service" was not defined. *Id.* Because the court found the covenant "so lacking in the essential terms which would protect the employee," it determined that it could not simply modify the agreement to make it enforceable; rather, it would have to rewrite the agreement, which it declined to do. *Id.*

*Freiburger* and *Pinnacle* control here. There is no dispute that AMX did not limit the restrictive covenants to only those clients with whom its employees had prior contact. There is no dispute that AMX failed to define the "work" its employees were prohibited from performing. There is no dispute that AMX failed to restrict the geographic area to those areas where the AMX employee provided services or had a significant presence or influence. *Cf.* Idaho Code 44-2407(3). This is sufficient under *Freiburger* and *Pinnacle* to make the noncompete agreements unenforceable as a matter of law.

AMX has not shown, and indeed it cannot show, any goodwill with the customers with whom the AMX employee had no contact and who are outside the territories where

the AMX employee provided services. Also, AMX has no protectable interest in prohibiting AMX employees from providing services that AMX does not provide to its clients.

Furthermore, the Court will not blue pencil the noncompete agreements. AMX cast its net too wide when it drafted the noncompete agreements, and reforming the agreements to make them reasonable would require a substantial rewrite of the contracts, which the Court declines to do. *See Freiburger*, 111 P.3d at 108. The Court therefore concludes that the contracts, which were unenforceable as written, cannot support AMX's action against Battelle for tortious interference with contract.

AMX, however, urges the Court to refrain from deciding this issue on summary judgment. Relying on *Miller*, *supra*, 127 P.3d 121, AMX argues "that the state of the record on a motion for summary judgment simply does not allow a determination as to the reasonableness of the noncompetition agreement." *AMX's Resp.* at 17. This overstates the holding in *Miller*.

*Miller* involved a non-compete agreement between physicians, which prohibited the departing physician, Dr. Miller, from practicing medicine within Ada and Canyon County unless he paid a $500,000 practice fee to the ophthalmology firm. The court held factual questions existed regarding (1) the nature and scope of the legitimate business interests the firm sought to protect, (2) the reasonableness of the practice fee; and (3) the degree the doctor-patient relationship affected the extent of the firm's protectable interests. *See Miller*, 127 P.3d at 127. But even after *Miller,* patently overreaching

noncompetition agreements may still be unenforceable as a matter of law. *See, e.g., Jorgensen v. Coppedge,* 181 P.3d 450, 454 (Idaho 2008)(finding that the covenants not to compete did not contain a limitation as to time and were thus void and unenforceable as a matter of law) (citing *Freiburger*, 111 P.3d at 105).

Moreover, the combination of factors presented in *Miller* convinces the Court that the case is readily distinguishable. In this case, unlike in Miller, there is no dispute regarding the nature and scope of AMX's protectable interests. *See AMX Resp.* at 16. Second, this case does not present the same questions at issue in *Miller* regarding the reasonableness of a practice fee. Finally, in *Miller*, the court wrestled with novel questions regarding the enforceability of noncompete agreements between physicians. In contrast, this case involves a standard noncompete provision between an employer and an employee, and none of those questions relating to physician noncompete agreements arise in that context.

In short, *Miller* does not dictate the conclusion that the reasonableness of the noncompete provisions at issue here must be determined by the fact finder. To the contrary, the noncompete agreements in this case more closely approximate the covenants in *Freiburger* and *Pinnacle* – which the Idaho Supreme Court found unenforceable as a matter of law. Accordingly, AMX's claim for tortious interference with contract will be dismissed.

## ORDER

IT IS ORDERED that Battelle Energy Alliance, LLC's Motion for Summary

Judgment (Docket No. 29) is GRANTED.



DATED: **October 7, 2010**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge

**MEMORANDUM DECISION AND ORDER- 16**